

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00417-CV

Richard Cecil **PETERSON** and Alma Peterson,
Appellants

v.

John Lawrence **JIMENEZ**, M.D. and Brian Phillip Perry, M.D.,
Appellees

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-08827
Honorable Renée Yanta, Judge Presiding[1]

Opinion by:      Marialyn Barnard, Justice

Sitting:          Sandee Bryan Marion, Chief Justice
                  Marialyn Barnard, Justice
                  Luz Elena D. Chapa, Justice

Delivered and Filed:  June 22, 2016

AFFIRMED

Richard and Alma Peterson appeal summary judgments granted in favor of appellees John

Lawrence Jimenez, M.D. and Brian Phillip Perry, M.D. in the underlying health care liability

action. Both summary judgments were granted on the ground that the doctrine of res ipsa loquitor

was inapplicable to the underlying cause. The Petersons contend the trial court erred because the

---

[1] This appeal addresses two summary judgments granted in favor of the appellees. The first summary judgment was granted in favor of appellee John Lawrence Jimenez, M.D. by the Honorable David Canales. The second summary judgment was granted in favor of appellee Brian Phillip Perry, M.D. by the Honorable Renée Yanta.

summary judgment evidence established the applicability of the doctrine. We affirm the summary judgments.

## BACKGROUND

Richard Peterson underwent an eight-hour surgery to remove a facial tumor on the left side of his face. After the surgery, Richard's right hand swelled, and he was diagnosed with right hand compartment syndrome which required an additional surgery.

Richard and his wife subsequently sued several health care providers associated with the first surgery. After various amendments to their petitions and nonsuits, the Petersons' only remaining claims were against Dr. Jimenez and Dr. Perry, and those claims were dependent on the applicability of the doctrine of res ipsa loquitor. As previously noted, the trial court concluded the doctrine was not applicable and granted summary judgments in favor of both Dr. Jimenez and Dr. Perry. The Petersons appeal.

## STANDARD OF REVIEW

Dr. Jimenez and Dr. Perry filed both traditional and no evidence motions for summary judgment. We review a trial court's granting of a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a traditional motion for summary judgment, the movant must show "there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law." TEX. R. CIV. P. 166a(c); *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial and the non-movant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements. TEX. R. CIV. P. 166a(i); *Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 157 (Tex. App.—San Antonio

2008, pet. denied). In reviewing a summary judgment, we take as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

## RES IPSA LOQUITOR

The Texas Supreme Court has generally explained the doctrine of res ipsa loquitor as follows:

> *Res ipsa loquitur*, meaning "the thing speaks for itself," is used in certain limited types of cases when the circumstances surrounding the accident constitute sufficient evidence of the defendant's negligence to support such a finding. *Res ipsa loquitur* is applicable only when two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Res ipsa loquitur* is simply a rule of evidence by which negligence may be inferred by the jury; it is not a separate cause of action from negligence.

*Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1980) (internal citations omitted). "However, *res ipsa loquitor* has been applied differently in medical malpractice cases." *Id*.

By statute, the doctrine of res ipsa loquitor can only apply to health care liability claims in those cases to which the doctrine was applied by appellate courts before August 29, 1977. TEX. CIV. PRAC. & REM. CODE ANN. § 74.201 (West 2011). "Historically, *res ipsa loquitor* has been restrictively applied in medical malpractice cases." *Haddock*, 793 S.W.2d at 951. In medical malpractice cases, the doctrine applies only "when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laymen, requiring no expert testimony." *Id*. Generally, the doctrine has been applied to the following three categories of cases: (1) negligence in the use of mechanical instruments; (2) operating on the wrong part of the body; or (3) leaving surgical instruments or sponges within the body." *Id*. Although the doctrine generally applies to these categories of cases, it does not automatically apply in every case. *Id*. For example, the doctrine does not apply in a medical malpractice case alleging negligence in the use of a

mechanical instrument "when the use of the mechanical instrument is not a matter within the common knowledge of laymen." *Id*.

## ANALYSIS

In this case, the Petersons assert the res ipsa loquitor doctrine applies because they alleged negligence in the use of a mechanical instrument, namely the operating table. The Petersons contend Richard suffered the injury to his right hand because of the manner in which he was positioned on the operating table during the eight hour surgery.

The summary judgment evidence in this case included the depositions of Dr. Jimenez and Dr. Perry. In Dr. Jimenez's deposition, he describes the operating table as follows:

> It's an electronic bed. It's pretty standard in all the operating rooms. It has a handpiece that I can control by remote — by a corded remote, to go up or down, back or forth, you know, rotate away, rotate towards, head up or head down.

Dr. Jimenez also described the positioning of a patient on the operating table:

> After the patient is asleep and all those other monitors are in for the patient, what we typically do — they're laying on a sheet, a draw sheet, and we'll take both arms, put them down by their side, thumbs up, hands free. There's a cradle foam, sort of cut in a V, it's flat. It would be like if you took a box of foam and you cut out a V shape, and the arm cradles down to support the underside of the arm and comes around the side of the arm. So, we put the arms in those V-shaped foams. I'm careful to get the foam up high enough so that it supports the shoulder, something I learned in my cardiac fellowship at Duke. We tucked all the arms, when I was a fellow at Duke for two years, for cardiac surgery. Just extra training above and beyond.
> Then we take the — we take the sheet then and roll it over the arm and then underneath the bed, so that the arm won't fall out during surgery. We do the same thing for the opposite arm. So then we switch sides. I carefully pull the sheet up, place the cradle foam there, put the arm in the cradle, put the sheet over, and then I lift that side of the bed, have the nurse put it in, and then we check the hands to make sure the hands are free, the fingers are free, that the IV isn't pressuring [sic] on any part of the arm. If the IV is in a place where it would be next to the arm, we typically pad that behind the IV and over the IV. If the blood pressure cuff is on the arm, we typically will pad where the port is coming out so it doesn't leave, you know, a pressure point, especially for a surgery of this length. That's typically how we pad.

Dr. Jimenez then described the roll test that is administered once the patient is padded and positioned:

> …. Typically, we — we pad them when we do this type of surgery. When Brian Perry came to town, we actually started doing a roll test. I don't know if you're familiar with this, but when we pad these patients, we pad their arms, we check them. The head is opposite where I'm going to be for the surgery. And then, in order to keep the patient in that position, we put one or two pads on the chest, and then there is a wide Velcro strap that goes across the chest to hold the patient in position and across the thighs. And then we turn the patient as far as the bed will go — not just a little bit — as far as the bed will go, with somebody standing on the opposite side, then back towards — so we get full rotation to make sure the patient is not going to move.

Finally, Dr. Jimenez testified regarding the manner in which the operating table is rotated during surgery:

> We typically might go head up a little bit, we might put the head down a little bit, so Trendelenburg or reverse Trendelenburg, but typically we go with the head up. The bed is rotated left and right, so away from the surgeon or towards the surgeon. And then, the third thing would be just raising the bed up or down. …. The bed is rotated away from you or toward you, if you're the operating surgeon. Let's say you're sitting on the left side and you're looking at the left ear, in that direction. To see certain things, you might rotate the bed away to get a view superiorly, you might rotate it back to you, to look more inferiorly.

Dr. Perry also testified about the roll test and the positioning of a patient. If any movement is observed during the roll test, Dr. Perry stated, "we would go back to midline and unstrap and make sure that they're refoamed and restrapped, so that they don't shift in the bed." Dr. Perry further explained positioning is important because "[p]ressure on any part of your body for prolonged periods of time can cause problems" and injuries can result to a patient when the pressure points are not properly padded.

One of our sister courts has addressed whether res ipsa loquitor should apply in the context of a fall from an operating table. *Hector v. Christus Health Golf Coast*, 175 S.W.3d 832 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). In that case, the patient underwent surgery to remove a cancerous tumor from her left ear. *Id.* at 834-35. During the surgery, the patient was

rotated so that the surgeon could better examine her, and the patient fell off the table while being rotated. *Id*. at 835. The Houston court noted, "No Texas court has previously considered whether an operating table can be considered a mechanical instrument," thereby questioning whether the claim fell within the "mechanical instruments" category of cases. *Id*. at 837. In holding the doctrine did not apply, the court noted "how an operating table works, the method of securing a patient to an operating table, or the procedures for rotating a patient during surgery are not necessarily within the common knowledge of laymen." *Id*.

Having reviewed the summary judgment evidence presented in this case, we agree with the Houston court. Assuming without deciding that an operating table is considered a mechanical instrument, neither the manner in which an operating table rotates during a surgical procedure nor the proper manner for padding and positioning a patient on an operating table is within the common knowledge of laymen. Accordingly, the trial court did not err in concluding the doctrine of res ipsa loquitor was not applicable in the underlying cause.

## CONCLUSION

The trial court's summary judgments are affirmed.

Marialyn Barnard, Justice